STATE OF IOWA, Appellee, v. IRVIN SEITZ, Appellant, et al.,
Appellees.

**CRIMINAL LAW:** Accomplices—Direct and Indirect Corroboration. On a charge of larceny, it is held that corroboration sufficient to carry the case to the jury is found in testimony tending to show that the defendant (1) was in possession of the stolen property very

soon after the larceny, (2) paid a very inadequate price for the property, (3) made incriminating statements in regard to the transaction, (4) knew that the property was new, and not salable as junk, and (5) aided in destroying the identity of the property.

STEVENS, C. J., WEAVER and FAVILLE, JJ., dissent.

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

NOVEMBER 24, 1919.

OPINION ON REHEARING APRIL 8, 1922.

REHEARING DENIED DECEMBER 15, 1922.

THE defendants were indicted for the crime of larceny in a building in Ottumwa, Wapello County, Iowa, in the nighttime. It is alleged substantially that they were guilty of the larceny of 1,200 pounds of railroad brass, belonging to the Chicago, Burlington & Quincy Railroad Company, and of the value of 40 cents a pound, or a total of $480. Defendant Seitz was engaged in the junk business in Keokuk, Iowa. It is not claimed that defendant Seitz was personally present at the time of the commission of the alleged crime, but it is contended that he was concerned therein as an accessory. He was tried, and found guilty, and judgment was pronounced. He alone appeals.— *Affirmed.*

*Gilmore & Moon*, for appellant.

*H. M. Havner*, Attorney General, *F. C. Davidson*, Assistant Attorney General, and *E. R. Mitchell*, County Attorney, for appellees.

ARTHUR, J.—I. The indictment on which appellant was tried charged that Irvin Seitz, appellant, H. H. Ryland, Charles Seward, and Hollis Printy, on April 10, 1917, in the county of Wapello, state of Iowa, "did willfully, unlawfully, and feloniously, in a certain building in Wapello County, Iowa, in the nighttime of said day, steal, take, and carry away 1,200 pounds

of railroad brass of the value of 40 cents a pound, all being the property of the Chicago, Burlington & Quincy Railroad Company, and of the aggregate value of $480.'' Defendants Ryland, Seward, and Printy entered pleas of guilty, were sentenced, and were paroled. Defendant Seitz pleaded not guilty, and was tried and convicted, and prosecutes this appeal.

Only one instruction is complained of, but the giving of the instruction was not properly excepted to. No errors are claimed in rulings on testimony. The question presented to us for our determination is the important one of whether there is sufficient corroboration of the testimony of Ryland, Seward, and Printy, alleged accomplices of appellant, Seitz, tending to connect Seitz with the commission of the crime charged, to take the case to the jury and to sustain the verdict. This question was sufficiently presented in the motion for a new trial.

On March 20, 1917, Ryland and Seward and a man by the name of Snyder stole from the Chicago, Burlington & Quincy car shops in Ottumwa a large quantity of brass used for repairs, consisting of 24 boxings for journals, which they secreted in the bank of the river near Ottumwa. Shortly afterwards, Snyder took out his share of the brass; and the balance of the stolen brass was not removed until the night of the 10th of April, when it was mingled with the brass alleged to have been stolen on that occasion, which was a larger quantity, and taken by boat to Eldon, where it was secreted.

The indictment on which appellant, Seitz, was tried does not allege the theft committed on March 20th. Evidence of the theft of March 20th was offered by the State, on the theory and claim of the State that, after such theft and before the larceny charged in the indictment, to wit, on or about the 8th or 9th day of April, Ryland and Seward visited Seitz at his place of business in Keokuk, and told Seitz, on that occasion, that they had already stolen some brass from the railroad shop in Ottumwa; and told him that they could get more in the same place; and that Seitz told them he would pay them 10 cents per pound, ''if they would get it down there to him.''

The record is without dispute that a larceny was committed, as charged, on the 10th of April, by Ryland, Seward, and Printy. The disputed question is whether or not Seitz so

aided and abetted in the larceny as to make him also guilty of the larceny. Seitz was not present at the taking and carrying away of the brass from the railroad shops. To show actual, physical taking and carrying away of the brass from the railroad shops, it would not be necessary to set out at length the testimony of Ryland, Seward, and Printy. These men admitted the taking and carrying away of the brass from the railroad shops. In fact, there is ample evidence by other witnesses and circumstances to show the theft of the brass from the railroad shops. It may be helpful to set out some of the testimony of Ryland, Seward, and Printy, for the purpose of understanding and testing the corroboration of their testimony claimed by the State. The testimony of these confessed thieves is not in entire harmony. Counsel for appellant argues that they unduly attempted to aid the State; and counsel for the State say that, although these defendants were paroled, they shaded their testimony, to shield appellant. These three defendants were men from 18 to 20 years old, and had been paroled. It was for the jury to weigh the testimony, and determine what it proved, if anything, if the case should have gone to the jury.

Ryland testified that he had sold Seitz railroad brass before; that, in regard to this matter, he first went to Seitz about the 8th or 9th of April, and that Seward was with him; that they talked about the brass, and how much Seitz would pay for it; that he asked Seitz how much he would pay for it, and he told them, 10 cents a pound, "if we would get it down there to him;" that Seitz told witness that there was some railroad brass which Charlie Seward and he could get, in the Chicago, Burlington & Quincy shops at Ottumwa, Iowa; that Seitz told them to come up and get it, and that they came up and got it, and took it down to Eldon in a boat, and put it there in a stump, and went back down, and Seitz advanced money to get a car to come up and get it; that they came up and got half of it, about, and took it down and broke it up; that then they came back up to get the rest of it, to ship it to Seitz from Eldon, and the officers caught them at Eldon with it; that, at the time they came up in a car, they delivered about a thousand pounds; that 1,240 pounds were shipped by express from Eldon; that they, he and Charlie Seward and Hollis Printy and Seitz, broke up

the brass at the junk shop in Keokuk. Ryland related breaking into the shops and stealing the brass in March,—the first larceny,—and told of the larceny on the night of the 10th of April. Ryland stated that, after the first interview by him and Charlie Seward with Seitz, "we were back to see him again about the 10th of April;" that they told Seitz that there was more brass; that they only brought part of it in the car on the morning of the 11th; that Seitz told them he would pay them 10 cents a pound for the brass; that Snyder was along, when they stole the brass on March 20th; that they told Seitz, before they came up and stóle the brass which they stole on April 10th; where they were going to get it; that he did not know exactly when he got the first brass, but that it was April 10th when they got the last. He said:

"When we got the last batch, we had been up here and stole from that house before. We had not taken it down to Keokuk and sold it. What we did with the first brass was that Snyder took his share out, and we put it in with the last batch all together, what we took down the last time. The first batch we buried down along the river. That was in March."

He said that they buried the first brass, and waited until they got the second batch, and took it to Eldon and buried it, and afterwards delivered it to Seitz, about the 11th of April. Ryland testified that Seitz gave them $16, after they had stolen both lots of brass. He said:

"The conversation in which I told Mr. Seitz about the brass was not the conversation at the time I got the money; it was before. I told him about the brass about a week before we came up here, and after the first time that I and Snyder and Seward had been up here, some time in March. A part of this brass we delivered down there was some that we had gotten on this first trip. In connection with telling Seitz where this other brass was, I told him about these new brasses I had gotten,—these 24 pieces,—and how I had gotten them."

Seward testified that he came to Ottumwa the first time in March, with Ryland and Snyder, when they got the brass in the railroad shops. He said:

"The next time I was in Ottumwa was about the 10th of April. We got some more brass that time. We broke into the

same place, and got the same kind of brass. Some of it was used and some of it wasn't. From there we took it in a boat down to Eldon. We left it at Eldon, and then we got a car and came after it from Keokuk. The brass we took to Keokuk in a car we sold to Irvin Seitz. I expect there was a thousand pounds."

This question was asked Seward:

"Had you had before that time [before the brass was delivered to Seitz] any talk with Seitz about brass? A. I hadn't. Q. When did you first talk with Seitz about this brass, if you did talk with him about it? A. Just before we came up the last time. Q. And when was that—when you came up in the car? A. Yes. I think so."

He testified that Seitz paid him about $25, and gave the other boys the same; and that, before they delivered the brass, they had got $16; that he did not remember just when it was that they had the talk with Seitz about the money. When asked the question, "And it was after the second robbery?" he answered:

"No, we had talked with him before that, I think. The day we got the $16 was the day we hired the machine from Bartholomew to come up. I don't remember what date that was,—it was after the second robbery. I think I had another conversation with Seitz before the time we got the money. It was a few nights before we got this last part of the brass. We talked of selling the brass. I went up with Snyder and Ryland and Printy. At that time, we told him we were going to get the brass. We told him the brass was in the Chicago, Burlington & Quincy shops, up here in Ottumwa. We told him where we had seen it, and that we had already gotten some. That conversation was before the second trip up here. We robbed the Q. the first time in March, and the second time in April. We had the first conversation with Seitz along about the first of April. The brass taken at the first robbery and that of the second was put together. We came to Ottumwa with Snyder, and robbed the Q. of this brass the first time. After we went back after the robbery, we told Seitz about the brass, and he said, 'Go ahead and get it.' He said: 'Bring it down here.

Get it here as soon as you can.' We told Seitz we had some brass that we had stolen."

Hollis Printy testified that his first acquaintance with Seitz was when he (Printy), Ryland, and Seward took the brass to his place; that he had seen Seitz before, but had no talk with him; that, on the 10th of April, he came to Ottumwa, and broke into the Chicago, Burlington & Quincy railroad building, and got the brass journals, which was the brass afterwards delivered to Seitz; that, after they got the brass and took it out of the shop on the night of the 10th of April, they took it to Eldon in a boat, and hid it outside of Eldon; that after that, they went to Keokuk, and saw Seitz about some money, and told him about the brass they had; that he gave them money, and they got an automobile and went to Eldon and loaded the brass; that the automobile broke down, and they hid the brass, and when the automobile was repaired, they loaded up the brass again, and took it down to Seitz. He said:

"We landed at Eldon about Friday noon, and it was Saturday night some time that we got the 'universal joint' for the automobile, and put it in. We got to Keokuk Sunday morning, and took the brass to Seitz's place. We broke it up on Monday. When we took it there, he advanced us $5.00 apiece. The brass was weighed Monday,—about 1,100 pounds. He was to pay us 10 cents a pound for it."

He said that the first talk he ever had with Seitz about the brass was the day they got the car, and that was after the last robbery; that they got the car a day or so after the last robbery; that they stayed at Eldon Friday night and Saturday night, and left Sunday morning for Keokuk. He further said that the stolen brass they did not take to Seitz by automobile was shipped from Eldon to Seitz. He said:

"We shipped 1,200 pounds, or a little better, of brass by express to Seitz at that time. This was a part of the brass taken from the C. B. & Q. I wasn't in on the first deal [March 20th]. I believe there were 152 pieces we took on April 10th. I and Ryland attended to shipping the brass from Eldon. That was part of the same brass we took April 10th."

He said that the brass taken on March 20th was mingled with the brass taken on April 10th; that he did not know just

what brass was delivered to Seitz in the car,—whether it was the brass taken in March or April,—and did not know whether the brass shipped by express to Seitz was taken in March or April; that the majority of it was brass taken April 10th, but part of it was what had been taken in March.

R. R. Potts, agent for the Rock Island at Eldon, testified to a conversation with Seitz while Seitz was in jail, on April 18th; that there were present A. E. Mullen, special agent for the Rock Island, and Mr. Cremer, and also Joe Bauer, detective for the Rock Island. Potts testified:

"The first time I talked to him, he said he didn't know anything about it."

On the next day, April 19th, Potts again talked with Seitz, and Seitz said "something about if he had got by with it, he would have gone and bought a little piece of ground, and moved a house onto it, and lived on it. He said he gave these other fellows that we had arrested for stealing brass $16 one time, and $9.00 one time, to hire an automobile. I don't remember that Seitz said anything about where these parties were getting the brass."

Potts further testified that, from his experience in railroad work, he would say that the price of the brasses was 38 cents to 40 cents per pound; that the shipment of brass from Eldon to Seitz was 1,240 pounds; that, in the conversation with Seitz, "he told me he was paying the boys 10 cents a pound for the brass."

A. E. Mullen, special agent for the Rock Island, talked with Seitz at the jail on March 18th, and afterwards in Keokuk. Potts, Bauer, Cremer, and Perry, the constable, were present. At the jail, Potts said to Seitz: "It looks like you have got in bad, advancing these boys money on this brass," and he dropped his head a little bit, and said, "Yes, I have." Mullen testified that he said he had advanced them $16 on the brass the first time, and later $9.00; that he had advanced them $16 to go up and get the brass, before they went up to get the brass at Eldon; and that they broke the car down; and that they sent back, and he advanced them $9.00 more; that he knew where the brass was coming from.

Joe Bauer, detective for the Rock Island, testified:

"When we first approached Seitz on the subject, he denied knowing anything about it. After we accused him of having bought this brass and handling it, and showing that we had evidence from those [Ryland, Seward, and Printy] that they told of selling brass to him, then he admitted having got the brass. He said, 'Yes, I had bought the brass from the boys.' He said the first delivery of brass to him was brought in an automobile,— 1,100 pounds. He said he had furnished the boys some money at two different periods for their expenses. He said the brass had been shipped from there to Chicago. He said he had made arrangements with them to take the brass at so much per pound, when they came and offered it to him. He said that he had made that arrangement prior to any delivery of the brass to him."

Seitz testified:

"I am the defendant; lived in Keokuk 35 years. I am single. Am in partnership with Sam Bower in the junk business. I know Ryland, Printy, and Seward. Have known Ryland since I have been in business with Sam. He has come around the junk shop occasionally, and sold stuff. Have known Seward probably two years or two and a half; Printy probably a year. I gave Ryland money several different times. I did, two or three days before I was arrested,—$16. He said he had some junk bought, and didn't have money enough to pay for it. Nothing was said at that time about wanting money for an automobile. He did not tell me where the junk was coming from. He did bring me some junk, just shortly before I was arrested,— old railroad brass. I told them the babbitt would have to be taken out of the brass, and the brass broken up, so we could get it in kegs and ship it. Afterwards they did that. I weighed the brass and babbitt, and paid them for it. I had bought railroad brass before. At the time I paid the $16 to Ryland, I had no personal knowledge of where this brass was coming from. Nothing was said to me by either Ryland or Printy or Seward as to where they were going to get the brass. After they got the brass, they did not tell me where they got it. I had a talk with Mr. Mullen, after I was arrested and brought up here and put in jail. I admitted to Mr. Mullen that I had bought the brass of Ryland. I never stated to Mr. Mullen that I knew

this brass had been stolen from the C. B. & Q. I would not have touched it if I had known it was stolen. There is some testimony about some brass having been shipped from Eldon to me. I do not know anything about that transaction except what I have heard from other parties. I never saw that brass; did not order it shipped to me; did not know it was going to be shipped to me; and never paid anything for it. I have advanced money to Ryland prior to this time, and he brought in the junk. I never had any question raised about it afterwards, as to whether it was stolen or otherwise. I did not state to Mr. Mullen that I advanced the boys $16 to go to Eldon to get brass. I told him that I had loaned the boys $15, but they told me they were going to get junk. I did not know they were going to get railroad brass, or where they were going to get it. I did not tell Mr. Mullen that I knew where the stuff was coming from. All I knew was, it was coming from Ryland. At the time I was brought up here, I did not know what I was arrested for; they did not tell me. When I got here [Ottumwa], I was put in jail. I think I saw Mr. Mullen that day, but I am not positive. Mr. Cremer and some of these gentlemen that have been on the stand were present. They all questioned me. I did not say to any of them that I knew the brass was stolen from the C. B. & Q. railroad. I did not say to any of them that I knew the brass was coming from Eldon. When they first commenced to question me about brass, there in the jail, I did not know what they were talking about, or what the transaction was. At that time, I told them I did not know anything about it. They finally told me about Ryland and them being arrested for stealing brass, and I told them that I had bought some brass from Ryland. I might have said something about buying land to Potts, but I didn't say anything about moving onto it, or anything like that, and I did not say anything about 'getting by' with this deal. I have testified to giving Ryland the $16. Between that and the day I was arrested, I did not give him $9.00 in addition, before they delivered the brass. I did not give anybody else $9.00. I did not say to Mullen or any of the others questioning me that I had given Ryland $9.00 in addition to the $16. The $16 was all that I gave Ryland. I don't remember that I told Mr. Bauer that I had furnished the boys expense money at two

different times. I have furnished Ryland expense money a number of different times, in a number of different deals. At the time I gave Ryland the $16, I never knew of his doing anything wrong before. I never asked Ryland to come up here and rob the C. B. & Q. roundhouse or any other place,—or Seward, or Printy, or Snyder,—or shops; steal any brass from the C. B. & Q. or any other road, or from any person. Neither Ryland, Seward, nor Printy nor Snyder ever said anything to me about my brass being buried up this way. They never told me they had stolen some brass, and had it up here. When they brought this first brass down, which I did buy, they did not say they had any more brass up here, and I did not tell them to go back and get the brass. I did not see them after that time, and before I was arrested. I told Mr. Mullen, when he asked me about this transaction, after I found out what I was arrested for, that I had bought the brass, and told him I had shipped it to Chicago. I did not know that the brass I bought from these boys was stolen brass. The first intimation I had that this brass was stolen was up here in the jail."

II. The evidence of the accomplices was sufficient to show the commission of the crime, and, if corroborated by other evidence tending to connect the defendant Seitz with the commission of the crime, was sufficient to justify the verdict.

Code Section 5299 provides, in substance, that all persons concerned in the commission of a public offense, though not present, if they aid and abet its commission, are to be indicted as principals.

Code Section 5489 is as follows:

"A conviction cannot be had upon the testimony of an accomplice, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely show the commission of the offense or the circumstances thereof."

We have often had occasion to consider this section. The language is clear that, unless there is evidence which can fairly be said to tend to connect the defendant with the commission of the offense, outside of the testimony of an accomplice, then a conviction cannot be permitted to stand. Also, the corroboration of an accomplice is not sufficient, under the statute, "if it merely

show the commission of the offense or the circumstances thereof.'' We have held, however, that the corroboration need not be as to every material fact testified to by an accomplice. The requirements of the statute are met if the accomplice is corroborated in some material fact tending to connect the defendant on trial with the commission of the offense. *State v. Dorsey,* 154 Iowa 298; *State v. Allen,* 57 Iowa 431; *State v. Hall,* 97 Iowa 400; *State v. Patten,* 191 Iowa 639; *State v. Christie,* 193 Iowa 482.

Corroborating testimony need not be direct. It may be circumstantial, and, whether direct or circumstantial, if it corroborates the testimony of an accomplice in a material particular, and tends to connect the defendant with the offense charged, it is sufficient to meet the requirements of the statute, and support a conviction. *State v. Dorsey,* supra; *State v. Patten,* supra; *State v. Christie,* supra.

Corroborating circumstances claimed by the State were:

(a) The possession of the stolen property, a portion of which was taken at the second larceny, the larceny charged in the indictment, which the jury might or might not find was sufficiently explained.

(b) The purchase of brass marked ''C. B. & Q.,'' at 10 cents per pound, which was worth 39 or 40 cents per pound.

• (c) The fact that part of the brass was shipped to defendant.

(d) Admissions made to witnesses Potts, Mullen, and Bauer.

Logically, from an examination of the record, to discover whether it affords sufficient corroboration of the testimony of H. H. Ryland, Charles Seward, and Hollis Printy, we meet the proven and admitted fact that the defendant Seitz was in possession of the recently stolen property. The presumption that arises from the possession of recently stolen property is one of fact. The jury was not instructed on the presumption arising from possession of recently stolen property, unexplained; yet the circumstances under which the brass was bought by Seitz and sold to him by the accomplices were of probative value, to be considered by the jury as tending to connect the defendant

with the commission of the crime alleged. *State v. King,* 122 Iowa 1; *State v. Stutches,* 163 Iowa 4.

Seitz went upon the stand as a witness in his own behalf. His explanation of his possession of the stolen property tends to show him guilty of receiving stolen property; but that is immaterial, if it also tends to connect him with the crime with which he is charged,—larceny. The brass purchased—some of it—was railroad brass, marked with the initials "C. B. & Q." Competent testimony shows that the brass was worth 39 or 40 cents per pound, and was bought by Seitz for 10 cents per pound. As a witness, Seitz did not deny that he had bought the brass at 10 cents a pound, nor did he deny that the price of used brass at that time was 38 to 40 cents a pound. Also, there was a lot of new brass, and all of the brass bore the initials "C. B. & Q. R. R. Co.," so that Seitz was advised and must have known of the character and value of the brass when it was delivered. To be sure, he did not see these initials on the brass until it was delivered to him; but if he had been innocent in this transaction, he would have paused at that point, at least long enough to find out whether these parties represented the railroad company, or how they happened to be in possession of these brass journals. Seitz, as a witness, gave an explanation of his possession of the property; and it was for the jury to judge of its truth and plausibility. The requirements of the statute are fulfilled if there be any corroborating evidence which, of itself, tends to connect the defendant with the commission of the offense. The metal was taken from the place of theft many miles to Keokuk, delivered to Seitz, and there broken up, and the brass shipped by Seitz to Chicago. It is claimed by Seitz that the breaking-up of the metal and the handling of it by him were open and undisguised. That was a circumstance to be considered by the jury, as bearing on the weight to be given to the evidence. *State v. Hogard,* 12 Minn. 293.

The jury might accept the explanation of Seitz, and it might also have believed that the breaking-up of the metal was for the purpose of destroying or making more difficult its identification, and for the purpose of quickly disposing of it. *State v. Miller,* 45 Minn. 521.

The effect of possession of recently stolen property is ably

discussed in *State v. Carter*, 144 Iowa 280. In that case, the testimony of accomplices was not involved. But some other person had possession of the stolen property after the larceny, and before it came into the possession of the accused. In the *Carter* case, we said:

"It is said in argument that this rule has no application where the evidence shows without dispute that some other person had the stolen property in possession after the larceny, and before it came into the possession of the defendant. We find no authority stating the alleged exception to the rule in these or equivalent terms. True, if the possession of another is interposed between the theft and the possession of the defendant, it is a fair and proper circumstance to be considered in his favor, and may sometimes be a controlling circumstance, tending to destroy or diminish the unfavorable inference which might otherwise be indulged in. But the story of an alleged purchase from a third person, not found or produced as a witness, though uncontradicted by direct evidence, may in itself be so unreasonable, or so out of the usual order of business transactions, that the jury may properly discredit it; or, if such prior possession in another be fully established, the circumstances of its transfer to the defendant may be so suspicious as to indicate the latter's complicity in the theft. The effect of testimony of this character, and the extent to which it rebuts the inference of guilt from recent possession of fruits of the crime, is for the jury. We are cited also to authorities holding that, when the accused gives a reasonable explanation of his possession of the stolen property, it becomes incumbent upon the State to show the falsity of the account. This may be conceded, but it remains for the jury to say whether the explanation offered is reasonable and credible; and, if the account is rejected as intrinsically unworthy of belief, the absence of any counter-showing by the State does not necessarily require a verdict of acquittal. The charge as given by the court sufficiently states the law on this feature of the case."

We are not cited to any case, and we know of no authority, where a court assumed to say that the explanation given by the accused was sufficient, as a matter of law. We think it is universally held that the effect of explanatory testimony and the

extent to which it rebuts the inference of guilt arising from recent possession of stolen property, are for the jury. It may be conceded that, when the accused gives a reasonable explanation of his possession of stolen property, it becomes incumbent upon the State to show the falsity of the account. But it remains for the jury to say, taking into consideration all of the testimony bearing thereon, whether the explanation offered is reasonable and credible; and if the explanation is by the jury rejected, as intrinsically unworthy of belief, the absence of any counter-showing by the State does not necessarily require a verdict of acquittal.

As bearing on the weight to be given to the explanation, the jury might well consider that Seitz purchased the brass at the extremely low price of 10 cents per pound, when it was worth 39 or 40 cents per pound. That Seitz was a junk dealer, and engaged in buying and selling brass and other metals, is a circumstance in his favor; but we think it could not be said, as a matter of law, to be a conclusive explanation that his possession of the property was entirely innocent. It would still be a question for the jury.

To avoid the force of the testimony of witnesses for the State that, when first asked about the transaction, Seitz pretended not to know what was referred to, counsel for Seitz strongly urge the truth and sufficiency of the explanations made by Seitz. Seitz may not have known the exact charge against him, but he certainly knew that he was being held either for larceny of this brass or for receiving stolen property. The jury was entitled to disbelieve his explanation, and evidently did reject it.

The second lot of brass that was taken in the larceny charged, was stolen April 10th. A part of it was delivered to Seitz a day or a few days later, and the balance of it was shipped from Eldon to Keokuk, addressed to "I. Seitz, Keokuk, Iowa." The fact of such shipment was a circumstance tending to bear out the prearrangement testified to by the accomplices, and tending to show that defendant was to aid in the theft of the brass by receiving and disposing of the fruits of the larceny.

We think that the conflicting statements made by defendant to Potts, Mullen, and Bauer, when he was informed of the

larceny, afford corroboration of the testimony of the accomplices. *State v. Dorsey,* 154 Iowa 298; *State v. Crouch,* 130 Iowa 478.

Potts testified:

"I did not talk much to Seitz on April 18th; it was the next day when we talked to him. We talked to him about this brass. The first time I talked to him, he did not know anything about it. And the next time we talked to him, he said something about if he had gotten by with this, he would have gone and bought him a little piece of ground, and moved a house on it and lived on it. He said he gave these other fellows that we had arrested for stealing brass $16 one time and $9.00 one time, to hire an automobile."

Bauer testified that, when he talked to him in the jail, Seitz at first denied any knowledge about the brass; but that, when confronted with statements made by the accomplices, he said he had gotten the brass and shipped it to Chicago. *He said he made the arrangements to take the brass prior to the delivery of the brass to him.*

Witness Mullen testified that, when he told Seitz that he was surprised,—that he thought he had more sense than to mix up with a bunch of kids,—Seitz admitted that it was very foolish to do it; and when Mullen said, "You have got in bad, advancing these boys money on this brass," he kind of dropped his head a little, and said, "Yes, I have." Neither in his statements to Bauer nor in his evidence as a witness did Seitz deny Ryland's evidence that the arrangement was to take the brass at 10 cents a pound, and that it was before the larceny charged. Seitz did admit to Bauer, if Bauer's testimony is believed, that the arrangement was made before the brass was delivered. This circumstance tends to corroborate the testimony of Ryland that Seitz knew they were going to steal the brass, and he was going to buy it, and was a circumstance to be considered by the jury in corroboration. It appears without dispute that 1,120 pounds of brass were delivered to Seitz on the 11th or 12th of April, or at most, a few days later, just after the second theft, on April 10th; so that the jury might well have found that Seitz had conversation with the other defendants, or some of them, concerning the brass not yet stolen, but to be stolen, and which

was stolen on April 10th,—the larceny with which he is charged.

It is insisted in argument by appellant's counsel that, because some of the circumstances shown are as consistent with innocence as with guilt, therefore they cannot be given force, as supplying the required statutory corroboration. We do not understand this to be the test. *State v. Bosch,* 172 Iowa 88, 93.

We reach the conclusion that there was sufficient corroborating evidence in the case to satisfy the requirements of the statute, tending to connect appellant with the commission of the offense charged, and to support the conviction of appellant; and that the trial court did not err in overruling the motion for new trial. The judgment of the trial court is, therefore, affirmed.—*Affirmed.*

EVANS, PRESTON, and DE GRAFF, JJ., concur.

STEVENS, C. J., WEAVER and FAVILLE, JJ., dissent.