STATE OF IOWA, appellee, v. EDWARD LEWIS FLETCHER, appellant.

No. 48578.

(Reported in 68 N.W.2d 99)

454

JANUARY 12, 1955.

James Lawyer and Don Hise, both of Des Moines, for appellant.

Dayton Countryman, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, and M. C. Herrick, County Attorney, of Indianola, for appellee.

THOMPSON, J.—This case arises out of the same burglary considered in the case of State v. Bales, 246 Iowa 446, 68 N.W.2d 95. On the night of December 21-22, 1953, a produce and feed store operated by Kenneth J. Butler in the town of Lacona, in Warren County, was broken into and a safe therein was entered and about $200 in money taken therefrom. The safe itself was not locked, but it contained metal drawers which were. These were broken into. The testimony shows they were forced open by the use of a steel punch which was later found in the possession of Charles Bales, the defendant in the other case to which reference is made above. This tool was identified as the instrument used by certain peculiar markings which left grooves in the metal drawers conforming to the punch itself. This matter was of determining importance in the Bales case. The defendant herein, being charged by a true information with the crime of burglary, was convicted by jury verdict.

The chief witness for the State in both cases was one James W. Kepler, an admitted accomplice. He testified that on the night in question he went with the defendant and Bales from Des Moines to Lacona; that Fletcher sat in the car while he and Bales

broke into the Butler store, opened the door of the unlocked safe and forced open the metal boxes, or drawers, and secured the money. The important question here, as in State v. Bales, is whether his testimony was sufficiently corroborated by other evidence tending to connect the defendant with the crime committed.

I. The defendant is described in the record as a "double amputee", by which is meant that he has lost both legs. Both Kepler and Bales had worked for him during the interval between the night of the burglary and the time Kepler was apprehended and confessed, about March 7, 1954. Kepler at least had been in Fletcher's employ for some time before December 21, 1953. Kepler and Bales each drove Fletcher's car at various times. Fletcher himself did not drive because of his physical condition; at least he refers to Kepler and Bales as his drivers. He says that Bales had driven for him "off and on" until about March 1, 1954, when he started to "work steady." At that time he discharged Kepler.

Kepler's story is that on the night in question he and Fletcher went in the latter's car to the Harlan Hotel, where Bales was staying. Bales produced a toolbox and took from it certain punches and other tools and put them in a satchel, resembling the one known in the record as State's Exhibit 17. He also brought two hammers, one being apparently an ordinary hammer and the other a sledge, from the basement of the hotel. These hammers are respectively Exhibits 18 and 19. Exhibits 17 and 18 were found in the defendant's automobile about March 8, 1954, when it was searched by Des Moines police officers, and Exhibit 19 was found under a rug or piece of carpet lying in the yard of his home. It is also testified that the defendant denied to Butler that he had been in Lacona on the evening of the breaking and entering. As to this latter point, it is undisputed in the record that Kepler and the defendant were at Butler's store in Lacona about 5:30 on the evening of December 21, and that defendant bought some eggs there.

Section 782.5 of the Code of 1954 requires that the testimony of an accomplice must be corroborated by other evidence which tends to connect the defendant with the commission of the offense charged before a conviction may be had. The State in argument

456

says emphatically that "to say there is no proof legitimately tending to corroborate James W. Kepler as to this particular transaction * * * is to shut one's eyes to manifest and unmistakable actualities, and to indulge in a bit of wholly irrational skepticism which the record does not warrant." This statement would have much more force if we were directed to the specific details of the evidence which are thought to support it. The argument of the State is directed almost wholly to generalities and statements of the rules of law governing corroboration of accomplices. We can agree with these without finding them determinative of the question before us.

■■ II. If there is corroboration of Kepler's testimony, it must be found in the possession of the two hammers and the satchel by the defendant, or his alleged denial that he had been in Lacona on the evening of December 21 before the time of the burglary. It is clear nothing in the finding of the steel punch, Exhibit 21, aids the State at this point. It was shown it was the instrument used in the commission of the crime. But it was found in the possession of Bales; there is nothing except the testimony of Kepler which connects it with the defendant here in any way. The rule as laid down in Wigmore on Evidence, Third Ed., Volume VII, section 2059, page 326, is this: "It is clear, as to the testimonial source of the corroboration, that it must be independent of the accomplice himself; it must rest on other than his credit." The corroboration required here must be something outside the testimony of Kepler which tends to show defendant participated in the crime. This evidence need not corroborate the accomplice in every material fact to which he has testified. Justice Bliss clearly expressed the material rule in State v. Cotton, 240 Iowa 609, 641, 33 N.W.2d 880, 898, in these terms:

"This court has repeatedly held that the corroboration need not be of every material fact testified to by the accomplice. The requirements of the statute are met if it can fairly be said that the accomplice is corroborated in some material fact legitimately tending to connect the defendant with the commission of the offense. The corroborating evidence may be either circumstantial or direct."

■ The application of these rules to the situation shown by

the record in the case at bar is the difficult question before us. But we think the correct conclusion is clear. The satchel, the small hammer and the sledge are connected with the burglary only by the testimony of Kepler. They are not instruments in and of themselves which show any improper use. The hammers are of such a nature that they could be used in a burglary; but they have legitimate uses much more numerous. As to the sledge hammer, Kepler himself said "Bales left it there" (on defendant's premises). Further he testified, "I throwed it under the rug so it would be out of the road. * * * After the burglary Chuck Bales took the hammer back to the Harlan Hotel. When I saw it it was already in Fletcher's yard and I lifted up the rug and threw it underneath. I don't know of my own knowledge who did put the hammer in the yard."

It must be kept in mind also that both Kepler and Bales drove defendant's car frequently, and each of them had ample opportunity to place the satchel and the small hammer therein. We have already pointed out there was nothing in the record to connect any of these articles with the Lacona burglary except Kepler's testimony, and that they were things which are ordinarily and generally used in entirely legal pursuits.

There is, however, one matter pertaining to the hammers which bears analysis. Robert Barton, identification technician for the Des Moines police department, testified that he found on each of the hammers some traces of blue paint similar to that found on the side of the steel punch, Exhibit 21, which was shown to have been used in the burglary. But we are unable to draw from this the conclusion that it supports the story of Kepler. The paint may have gotten upon the hammers in any one of various ways. They may have been used in some proper pursuit at the same time as the punch; or the paint may have been deposited upon them at an entirely different time than upon the punch. No fair inference of guilt of the defendant may be drawn from this circumstance alone.

Butler, the operator of the burglarized store, testified thus: "Mr. Fletcher told me he was innocent. He told me he wasn't down there that evening my shop was broken into. I told him what happened during the transaction and finally he admitted he was there during that evening."

Upon cross-examination this witness further said: "When I referred to a conversation that I had with Mr. Fletcher wherein he stated he wasn't there on that night, I am referring to the evening. I am not trying to infer that he finally admitted he was there when the place was broken into. * * * When I talked with Mr. Fletcher he continually asserted that he hadn't broken into my place."

John Taylor, sheriff of Warren County, testified as to this incident: "The defendant admitted he was there and had secured a small amount of eggs from Mr. Butler." On cross-examination he said: "During the conversation between Mr. Butler and Mr. Fletcher, Mr. Butler said, 'Yes, that is the fellow that has been to my place of business' and Fletcher denied it at first and then later said he was." It is not clear that Fletcher understood that the time he was accused of being in the Butler store was not the time of the burglary. His own testimony is this: "Mr. Butler said, 'You was in my town on the 21st and helped those boys rob my place of business' and I told him he was wrong. I never denied that I had been down there between five and six o'clock in the evening." Evidence of oral statements must always be received with caution, since it is subject to imperfect memory or misconstruction of what was actually said. Fletcher may well have understood that Butler was accusing him of being in Lacona at the very time of the robbery. But, assuming there was some evidence of his denial of having been there in the early evening, it is undisputed in the record he did not alight from the car during the egg-buying mission. He had no opportunity to "case the joint", as the argot of the underworld puts it. Kepler does not say they went to Lacona and to the Butler store for that purpose. Fletcher was in the business of wholesaling eggs, and there is nothing to show the earlier trip to Lacona was not an entirely proper one upon a legitimate business errand.

It has been said that falsehoods told by an accused may under certain circumstances amount to corroboration of an accomplice. The rule is thus stated in 22 C. J. S., Criminal Law, section 812, pages 1404, 1405: "* * * misrepresentations, contradictions, or silence of accused when accusing statements are made may have the same effect as a confession or admission as corroborative of the accomplice, *especially where there is other cor-*

*roborative evidence* \* \* \*." (Italics supplied.) It has also been held that the fact defendant told suspicious lies about the crime is not sufficient. People v. Koening, 99 Cal. 574, 34 P. 238.

Two Iowa cases are sometimes cited as holding that falsehoods told by the accused may corroborate the testimony of an accomplice. But in State v. Seitz, 194 Iowa 1057, 187 N.W. 695, the actual statements made by the defendant were in fact in the nature of admissions which clearly tended to show his guilt. The same was true in State v. Bosch, 172 Iowa 88, 93, 153 N.W. 73, 74, 75. In the latter case there were several other circumstances which corroborated the accomplice, and it is impossible to say what weight, if any, was given to the statements of the accused in determining the point. The cases which are cited as holding that false statements of an accused may be corroborative upon analysis will be found generally to be based upon something therein which may be construed as an admission or to be supported by other corroborative evidence.

██ ██ We are unable to hold that a denial by Fletcher that he was in Lacona in the early evening of December 21, if he made such a denial, would amount to the quantum of corroboration required by our statute. In fact, the State does not argue that it does. Nor are we impressed by the thought advanced by the State that, since the jury was instructed it should not convict unless it found something in the evidence tending to corroborate Kepler's testimony at some material point, and it did convict, we must assume there was such evidence. It was the duty of the trial court to pass upon the sufficiency of the corroboration as a matter of law in the first instance, that is to say, to determine whether there was such corroboration that the case should be submitted to the jury. State v. Winters, 209 Iowa 565, 228 N.W. 286.

██ It is said in Wigmore on Evidence, Third Ed., Volume VII, section 2059, page 334: "The requirement of corroboration leads to many rulings as to sufficiency, based wholly upon the evidence in each case; from these no additional development of principle can profitably be gathered. As recorded precedents of Supreme Courts, they are mere useless chaff, ground out by the vain labor of able minds mistaking the true material for their energies."

460

In the light of this philosophy, we have perhaps already discussed the facts in the case before us at too great length. It is our conclusion there was no sufficient corroboration of the testimony of the accomplice. The defendant's motion for a peremptory verdict should have been granted.—Reversed.

All JUSTICES concur.