STATE OF IOWA, appellee, v. JAMES HUNTINGTON, appellant.

No. 49058.

(Reported in 80 N.W.2d 744)

FEBRUARY 5, 1957.

Camp & Harsh, of Creston, for appellant.

Dayton Countryman, Attorney General, and Dudley C. Lowry, Assistant Attorney General, both of Des Moines, and Arnold O. Kenyon, County Attorney, of Creston, for appellee.

SMITH, J.—Defendant is a fifty-four-year-old married farmer with a married, adopted son (23) and a daughter (13). He was convicted of sodomy alleged to have been committed April 2, 1956, with 15-year-old Billy Fry. The situs of the alleged crime was defendant's home farm (belonging to his mother) at the edge of Creston.

Billy Fry and his cousin Gale Fry (14) came out to defendant's to ride a horse defendant had allowed them to ride on previous occasions. It was the day after Easter—"Gale Fry and I rode one bike and Danny Norris and Larry Oswald came out

later. We arrived sometime around 11:30 in the morning. We rode the horse and Jim Huntington finished hauling manure and plowed the garden with a team. * * * Danny Norris and I wrestled around in the haymow alone. Jim Huntington came up * * * threw down some hay and then wrestled around with me and with Danny Norris." He "sent Gale Fry and Larry Oswald to the store with some money to get something to eat * * *. After they went, Danny was watching to see if they were gone and Jim wrestled with me, unzipped my pants, took his teeth out and put my penis in his mouth. * * * Jim Huntington zipped my pants back up and I went downstairs. That was around 12. Then I rode the horse some more. It wasn't long until Larry and Gale came back * * * and shortly Danny came down. We took turns riding the horse the rest of the day."

On cross-examination the prosecuting witness said defendant made no threats, that on the way home he, the witness, told Gale what had transpired but did not tell his own parents.

Danny Norris (15) told about the same story but said he and defendant had been up in the haymow earlier in the day and defendant had done a similar thing to him. He also said he had been out at the farm March 17 and 19.

On cross-examination he said: "I stood guard for Billy and then Billy stood guard for me." But Billy seems not to have been present on the occasion when Danny and defendant committed the act. On redirect Danny testified over objection that defendant had commenced a similar act with him on the March 19th occasion but Gale Fry came up "and he got up and was pretending he was wrestling with me."

Defendant, on cross-examination of this witness, had him identify and then introduced a written statement, dated April 7, 1956, signed by him, in which he confessed he and Larry Oswald and another boy stole two BB pistols and a BB rifle on March 31, 1956.

In that statement also occurs this paragraph: "Sometime the first of March, 1956, Gale Fry, Billy Fry and myself went out to Jim Huntington's and on the way home Gale Fry and Billy Fry told me that Huntington had paid them $.25 apiece to suck them off. * * *"

Gale Fry testified he had been out to defendant's "about

six times", that the first time "was the middle of March and Duane Lang (13) was there with me. We just rode the horse." His version of the April 2nd visit to the Huntington home dovetails with the other boys' account. He tells of "splitting" up the candy after returning from the store and of riding the horse, etc. He also relates (over objection) the story of the March 19th occurrence when he interrupted defendant and Danny Norris and defendant "started acting like he was wrestling." He also testified (over objection) of an occasion in March when he was out at defendant's with Duane Lang: Defendant reached down inside Duane's pants. "Duane grabbed his hand and wouldn't let him do it." He also testified "the only thing he (defendant) ever did with me was to reach down inside my pants once. * * * I just pulled his hand away and didn't let him do it."

We have perhaps set out enough of the disgusting story. It seems impossible to compress it. So many actors are involved. The testimony of Larry Oswald and Duane Lang corroborated the general story of the presence of the boys at defendant's farm. Duane refers to one occasion when he and Gale Fry were out there: "He tried to put his hand down in our pants but we wouldn't let him."

Danny Norris was recalled and explained how he happened to be looking through the crack in the barn wall April 2 "when the act with Billy was committed. I was about 10 or 15 feet away from him * * *. Jim said 'Have they left yet?' and then I just stood there and I was watching Jim and Billy and then I just looked back outside to see, to look out there, no special reason."

We have not in this review always indicated what (or whether) appropriate objections were urged. But we shall grant that sufficient record was made throughout as foundation of defendant's contentions on appeal.

Defendant denied commission on April 2 of the criminal acts testified to by the State's witnesses. He admits permitting the boys to ride the "saddle mare." He testifies he put the bridle on for them but allowed them to saddle her. He says he was hauling manure from the barn and had his team hitched to the spreader. He had only the one team and the saddle mare.

He claims he told them the saddle mare was not to be taken out unless he was there. He finished manure hauling and then plowed the garden until a little after the noon whistle when he put his team up and told the boys "The mare will have to be fed now." He says "I feed my horses at noon whether I get fed or not."

He also testifies he heard the boys in the haymow swearing and calling vile names and "hollered" to them "That is enough of that; get down out of there." He says he had not been up in the mow for some time as he had sold the baled hay. "There is a little bit of loose hay now, as there was at that time."

On cross-examination he says there were two days the boys were at the farm—"the day the steer was loose, and the day the four of them were there." He also testified when he would not let them ride the mare any longer one of them said "You are getting to be as hard to get along with as your wife" and another said "I'll get even with you for this."

Defendant's wife testifies she saw some boys at the farm but "would not know them"; and on one occasion when Jim was not there she says "the boys" were smoking and she asked them not to go in the barn and "not to ride the horse because it did not belong to us." She also says the barn was damaged once when the horse got away from the boys.

Two witnesses testified defendant's reputation for moral character was good, but one of them said "I have heard some rumors * * * you hear a lot of things that I don't pay any attention to." On redirect he said those he had heard "were since this case was put out in the paper."

On rebuttal four State's witnesses (three police officers and an auctioneer from an adjoining county) testified his reputation for moral character was bad.

At the close of the evidence defendant moved to strike "all testimony of the witnesses Danny Norris, Gale Fry, Larry Oswald, and Duane Lang as to any crimes or occurrences prior to April 2, 1956, for the reason that evidence of crimes with other persons than the prosecuting witness, Billy Fry, is not admissible to prove a crime charged." The trial court overruled it.

Defendant then moved for a directed verdict contending

Billy Fry and Danny Norris were accomplices and their testimony uncorroborated, as required by Code section 782.5, and the evidence was therefore insufficient to justify a verdict of conviction. This was also denied by the trial court.

The case accordingly went to the jury, there was a verdict against defendant, he was sentenced and appeals.

Defendant assigns but two errors:

"Error No. 1. The Court committed error in not directing a verdict in favor of the appellant and against the State.

"Error No. .2. The Court committed error in admitting testimony of other crimes and transactions with persons other than the prosecuting witness."

I. The argument on Error No. 1 is based squarely upon the proposition that the court should have found both Billy Fry and Danny Norris were accomplices, and their testimony tending to connect defendant with the crime charged was uncorroborated in that respect and therefore insufficient, under section 782.5, Iowa Code, to corroborate Billy's testimony connecting defendant with the act.

■ Billy Fry's testimony, conceding (as did the trial court) that he was an accomplice (see State v. Simpson, 243 Iowa 65, 70, 50 N.W.2d 601), nevertheless was admissible and required no corroboration to be considered as evidence that the crime was committed by someone. State v. Thom, 236 Iowa 129, 130, 17 N.W.2d 96. The evidence in such a case is admissible. Whether there is the required corroboration depends on the circumstances of the particular case. State v. Cotton, 240 Iowa 609, 641, 33 N.W.2d 880.

■ While corroborative evidence which merely raises a suspicion that accused is the guilty party is not sufficient, there need not be the same quantum as when the evidence is tendered as substantive proof of guilt. State v. Gates, 246 Iowa 344, 351, 67 N.W.2d 579. Nor need it go to the whole of the accomplice's testimony or of every material fact. State v. Fletcher, 246 Iowa 452, 456, 68 N.W.2d 99.

■ Defendant would have us hold Danny Norris an accomplice as a matter of law and discard his corroboration as being itself unsupported. His summary at this point is as follows: "The State's evidence is that Danny Norris sent Billy Fry up

to the haymow. * * * he stood guard and told Billy Fry and appellant when the other boys had left. * * * Danny Norris, under the evidence * * * had to know the purpose for sending Billy Fry up to the haymow at the time he sent him up there."

The argument is skillful but not an accurate interpretation —or at least not the only reasonable interpretation—as to the order of events. It is true Danny tells of defendant committing the act with him and adds: "He zipped my pants up and I went downstairs and sent Billy up." But that seems not to relate to the occasion when the alleged crime with Billy was committed. Danny says defendant and Billy came down. Sometime thereafter defendant sent the two other boys to the store: "Then Billy and I went upstairs and Jim came upstairs and was wrestling," etc.

The circumstance of Danny "standing guard" occurred at this later time—when he, defendant and Billy were all in the haymow. It was a more casual and unpremeditated—even unnecessary—assignment than defendant's argument paints it. The testimony of neither boy is so clear as to make Danny an accomplice as a matter of law. Though Danny on cross-examination admitted "I stood guard for Billy and then Billy stood guard for me", there is no testimony Billy was even present when defendant and Danny performed the act. Danny's status was for the jury under proper instruction. There is no complaint as to the form of instruction given.

We said in State v. Tippett, 244 Iowa 1350, 1354, 60 N.W.2d 538, 540: "The parties agree the general rule for determining whether a witness is an accomplice is whether he could be charged with and convicted of the specific offense", citing State v. Thom, 236 Iowa 129, 17 N.W.2d 96; State v. Brundage, 200 Iowa 1394, 206 N.W. 607; State v. Duff, 144 Iowa 142, 122 N.W. 829, 24 L. R. A., N. S., 625, 138 Am. St. Rep. 269. See also State v. Jones, 115 Iowa 113, 120, 88 N.W. 196, and citations in "Notes of Decisions", section 782.5, 57 West's I. C. A., page 383, under heading "Persons considered accomplices."

II. The second error assigned is: "In admitting testimony of other crimes and transactions with persons other than the prosecuting witness"; and in argument: "Testimony of a witness other than the complaining witness of a sodomy com-

mitted a half month before the time charged"; and "testimony of lascivious acts toward two other witnesses a month or so before the crime charged."

The State's case is built upon the testimony of five boys, including Billy Fry, two age 14 years, two 15, and one only 13. All but the 13-year old were at defendant's place April 2, 1956. It surely was not immaterial to develop evidence of the habit of this group of making the Huntington farm a place of rendezvous, riding the "saddle mare" and wrestling in the haymow. It was a reasonable introduction to their presence there April 2, 1956.

The first suggestion of wrongful conduct earlier than April 2 was brought in by defendant during cross-examination of Danny Norris. He was confronted by his own written statement, dated April 7, 1956: "Sometime the first of March, 1956, Gale Fry, Billy Fry and myself went out to Jim Huntington's and on the way home Gale Fry and Billy Fry told me that Huntington had paid them $.25 apiece to suck them off." Defendant offered the writing in evidence and it went in without objection.

Following that, Danny *on redirect* told of defendant's commission of the act with him on March 19, two weeks before the April 2 occurrence. The next witness was Gale Fry who on direct examination told of interrupting defendant on March 19 in the act with Danny in the haymow, and of defendant's pretense they were just wrestling. Gale also told of seeing defendant reach down into Duane Lang's pants and of his advances being rejected by Duane. He thought it happened "between the middle of March and the 1st of April." Gale also testified defendant did the same with him but "I just pulled his hand away and didn't let him do it." Duane Lang also told of defendant's overtures to him and Gale.

The necessity for corroboration, in some cases and for certain purposes, furnishes constant pressure upon the courts to weaken the general, salutary rule against permitting evidence of other offenses. Defendant's brief here lists various exceptions to the rule which have grown up in criminal cases. And the trial court in ruling had occasion to refer to "this type of case"— "In this type of case other acts on other occasions can be proven."

The exceptions listed by defendant are cases where the evidence sought to establish: 1. Motive; 2. intent; 3. absence of mistake or accident; 4. a common scheme embracing the commission of related crimes where proof of one tends to prove the other; and 5. identity of the defendant on trial. After listing or classifying them thus, defendant asks: "Under which exception could it be possible to introduce" such evidence in a sodomy case? We suggest No. 4 above as a likely candidate.

In discussing and distinguishing various cases defendant has some difficulty with State v. Simpson, 243 Iowa 65, 50 N.W.2d 601, and State v. Crisman, 244 Iowa 590, 57 N.W.2d 207. Both are comparatively recent sodomy cases, involving the question urged here.

Defendant dismisses the Simpson decision by commenting: "The court allowed testimony of liberties taken with other persons * * * immediately" (the court said "shortly") "prior to the crime of sodomy, and the court referred to exceptions to the general rule, citing State v. Baugh, 200 Iowa 1225, 206 N.W. 250, which involved a crime of uttering a forged instrument, in which intent would be an essential element."

He adds, it is apparent the testimony was allowed "because the events were so closely related in time and circumstance that they were directly involved in the act charged."

As to the Crisman case he attempts no explanation except to quote from that opinion (244 Iowa, at page 596, 57 N.W.2d, page 211): "There was a sharp dispute as to how close was the association between defendant and the witness Jones. It [the evidence] has probative value upon this question and also upon the question of their relationship. We think it was admissible under our decisions."

Then follows a quotation from State v. Campbell, 209 Iowa 519, 522, 228 N.W. 22, which is a pertinent reminder here: " 'The evidence was not offered for the purpose of proving another crime. If the facts proved had a material bearing upon the issues in the case, they were admissible in evidence; and this would be true regardless of whether they constituted a crime or not.' "

In the Simpson case defendant's counsel at commencement of trial tried unsuccessfully to preclude admission of evidence

of other offenses by stating in open court that if the act was done by defendant " 'it was not unintentional or accidental or inadvertent' ", 243 Iowa, at page 72, 50 N.W.2d, at page 604. We upheld the trial court in rejecting the contention.

Defendant on this assignment is compelled to stress—even to exaggerate—the time element between the date of the "other crimes" and that of the crime with which he is charged. Time of course must be considered but it is not conclusive. The relationship between or among the parties, the similarity of the occasions and locations, and doubtless many other things enter into the calculation.

We have tried to be objective and uninfluenced by the repulsive character of the crime charged and of the acts described. But we find no legal merit in the assigned errors.

III. Defendant's attorneys at the commencement of the examination of defendant as a witness tendered defendant's willingness to submit to a lie detector test or a truth serum, with an agreement that the result could be offered in evidence by either party. The county attorney objected, the trial court sustained his objection and no error is predicated upon the ruling.

We are not sure science or legal thinking has reached a conclusion as to this form of evidence that would justify an assignment of error by defendant on account of its refusal.

This opinion has gone into detail perhaps more than is justified by the ultimate simplicity of the questions presented. But the welfare of a fifty-four-year-old man and his family must be our excuse. We find no reversible error.—Affirmed.

All JUSTICES concur.